IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DERRICK F., a Minor, by his** | : | |
| **Parents and Natural Guardians,** *et al.,* | : | **Civil No. 1:06-CV-1463** |
| | : | |
| **Plaintiffs,** | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **v.** | : | |
| | : | |
| **RED LION AREA SCHOOL** | : | |
| **DISTRICT,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**M E M O R A N D U M**

Scott F. and Sherry F., on behalf of their minor child Derrick F.
(collectively "Plaintiff"), bring this suit against Defendant Red Lion Area School
District ("the District") pursuant to the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400 *et seq.*, the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12130 *et seq.*, and Section 504 of the Rehabilitation Act of 1973
("Section 504"), 29 U.S.C. § 794.  Before the court are Defendant's motions to
dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject
matter jurisdiction (Doc. 77), and for summary judgment (Doc. 88).  Also pending is
Plaintiff's motion *in limine*.  (Doc. 97.)  The parties have briefed the issues, and the
motions are ripe for disposition.


I.        **IDEA Statutory Framework**

The IDEA guarantees the right of students with disabilities to a free and
appropriate public education ("FAPE").  20 U.S.C. §§ 1400 *et seq.*  To this end, the
IDEA includes numerous procedural safeguards.  *See* 20 U.S.C. § 1415.  Local
school districts are required to work together with parents of children with
disabilities to develop an individualized education program ("IEP") for that child.

An IEP is a written statement that must include, among other things, the child's present level of achievement, measurable annual goals, and the supplemental aids and services that are required to meet those goals.   § 1414(d)(1)(A)(i).   An IEP must be prepared by a team consisting of the parents of the child with a disability, at least one regular education teacher, at least one special education teacher, a representative of the local educational agency, and where appropriate, the child. § 1414(d)(1)(B).

If the parents are dissatisfied with any aspect of the IEP, then they may file an appeal.   The IDEA requires each state to develop an appeal process.   The Pennsylvania Department of Education has developed a two-step appeal process.[1] The first stage is known as a "due process hearing."   *See* 20 U.S.C. § 1415(f) (impartial due process hearing).   If either party is dissatisfied with the result of the hearing, an appeal of that decision may be taken to the state educational agency. § 1415(g).   Any party dissatisfied with the outcome of the administrative procedures may bring suit in federal court to challenge the IEP placement.   § 1415(i)(2)(A). During the pendency of any proceedings to challenge a child's placement, the child is to remain in his or her current educational placement.   § 1415(j).   The IDEA requires the exhaustion of these administrative remedies prior to bringing suit under the Constitution, the ADA, and Section 504 of the Rehabilitation Act, to the extent that a plaintiff seeks relief also available under the IDEA.   § 1415(l).

Additionally, the Pennsylvania Department of Education has developed an elective process for enforcement of an IEP.   *See* 22 Pa. Code § 14.107; *see also*

---

[1] Pennsylvania recently amended its appeals process to permit parties to appeal the decision of a hearing officer directly to a court, rather than the state educational agency.  *See* 22 Pa. Code § 14.162(o).  This provision took effect on July 1, 2008, and does not apply to this case.

34 C.F.R. §§ 300.151–300.153.[2]  A parent may file a complaint with the Division of Compliance of the Bureau of Special Education of the Pennsylvania Department of Education ("PDE").  After investigation, PDE issues a Complaint Investigation Report ("CIR").  Because this process is elective, exhaustion of this complaint investigative procedure is not required prior to filing suit to enforce an IEP.

## II.        **Background**

The facts, viewed in the light most favorable to Plaintiff, the non-moving party, are as follows:[3]

Derrick F. is a twelve year old child with severe hearing and vision impairments caused by meningitis, which Derrick contracted at the age of six months.  Derrick has limited sight and vision, and he communicates through a system of "total communication," including sign language, speech, pictures, and print.  Derrick engages in self-stimulation, flapping his lips and arms to make noise when his communication needs are unmet.  Derrick also has a history of self-injury, including hitting and biting himself, when his communication needs are unmet. (Sherry F. Dep. 22:3-18, Jan. 3, 2008.)  Derrick is a qualified individual with a disability under the IDEA, Section 504, and the ADA.

Derrick lives within the Red Lion Area School District, which includes the Locust Grove Elementary School.  Red Lion Area School District is served by

---

[2] These sections were previously codified at 34 C.F.R. §§ 300.660-300.662.  On October 13, 2006, following the amendment of the IDEA in 2004, the Department of Education published final regulations and those sections were moved to 34 C.F.R. §§ 300.151–153, but not substantially modified. *See* 71 F.R. 46770-71.

[3] The facts in this case are generally undisputed, except where noted.  However, the parties vigorously dispute the significance of these facts and the inferences that may be drawn from them. Because this case is at the summary judgment stage, the facts will be set forth in the light most favorable to Plaintiff, the non-moving party.

the Lincoln Intermediate Unit ("LIU"), a regional educational service agency that provides educational support, including special education assistance, to schools in Adams, Franklin, and York counties.

### A.   2002–2005 School Years

From June 2002 until September of 2004, Derrick attended the Perkins School for the Deaf in Massachusetts.  (Sherry F. Dep. 15:25–16:05.)  The District agreed with Derrick's placement at the school, which was included in Derrick's IEP at that time.  (*Id.*16:06–11.)  Derrick was asked to leave the school in September 2004 after a biting incident.  Thereafter, Derrick's parents contacted District officials about placing Derrick in his local school, Locust Grove Elementary.  In November 2004, an IEP meeting was convened, and Derrick's parents were informed that the school district was recommending a placement at the Maryland School for the Blind. (*Id.*50:6–11.)  This placement was rejected by Derrick's parents, who felt that it violated the least restrictive environment mandate of the IDEA.  (*Id.* 51:11-17.) Instead, during the 2004-2005 school year, Derrick was educated at home.  (*Id.* 49:19-21.)

Derrick's parents and the District ultimately settled all IDEA claims arising out of the 2004–05 school year.  Derrick's parents hired Dr. Julie Jones to provide consulting, and Susan Prowell to act as an "intervener" for Derrick. Although Derrick's parents were dissatisfied with Prowell's sign language skills, Derrick experienced language growth during this period.  (*Id.* 40:11–19.)  Derrick's mother attributes this progress to the constant training and feedback provided to Prowell by Dr. Jones.  (*Id.*)

### B.   2005–06 School Year

In fall 2005, Derrick's parents initiated a due process hearing to challenge the provision of Derrick's IEP placing him at the Maryland School for the

Blind.  The hearing officer agreed with Derrick's parents that the Maryland School for the Blind was not the least restrictive environment.  On October 31, 2005, the hearing officer ordered the District to place Derrick in the school he would attend if he were not a student with a disability, and awarded compensatory education.  (Doc. 69, Ex. A.)  Both the parents and the District appealed the decision.  In a decision issued on December 16, 2005, the intermediate appeals panel affirmed the placement, but reversed the award of compensatory education.  (Doc. 69, Ex. B.)  Neither party brought suit in court to challenge the placement or any other aspect of the appeals panel decision.  Accordingly, the District had thirty days to implement the order.

In early 2006, District and LIU employees visited Derrick at his home to evaluate him.  (Sherry F. Dep. 83:3-24.)  After observing him on two occasions, a hearing teacher and a vision teacher at the District prepared a report.  (*Id.* 83:3-24.)  In March 2006, Derrick also visited the school twice for evaluations.  (*Id.* 84:8-17.)  However, Derrick's IEP team did not meet, no IEP was created, and Derrick did not attend school.  Nevertheless, on February 8, 2006, the District superintendent signed an Assurance of Implementation of the Appeals Panel decision, and submitted it to the Pennsylvania Department of Education.  In that letter, the superintendent assured PDE that "we have implemented the Hearing Officer's award by assigning Derrick F. to the Locust Grove Elementary School and are in the process of transitioning Derrick F. to a program in the building."

On March 1, 2006, the Education Law Center wrote to the PDE on behalf of Derrick, claiming that the District had failed to implement the hearing officer's order.  (Doc. 69, Ex. D.)  In the letter, Derrick sought immediate placement in a regular education classroom with appropriate supplemental services, as ordered by the hearing officer, and compensatory education for the time Derrick was not

provided with those services.  (*Id.*)  On March 21, 2006, the agency responded with a letter directing the District to immediately place Derrick in a regular education classroom with supplementary aids and services.  The agency further directed that Derrick's IEP team must convene no later than March 31, 2006 to finish developing Derrick's IEP.  (Doc. 96, Ex. 10.)

Pursuant to the PDE's letter, Derrick's IEP team was convened and an IEP meeting was held on March 31, 2006.  After an eight hour meeting, an IEP was preliminarily agreed to, including a transition plan for Derrick to attend school.  The pertinent aspects of the IEP for purposes of this litigation are as follows:

Classroom Placement — Derrick is to receive 70% of his instruction in a regular classroom with supplementary aids and services.  (March 31, 2008 IEP at 49.)

Deafblind Coordinator Training — "Professional with experience and training in working with children with deafblindness to provide training to regular education teacher, special education teacher, and therapists."  Training is to be provided at school.  As for the frequency of the training: "Initial training within the first month of Derrick's program, with additional training sessions over the first 6 months of Derrick's program.  Same training to be provided to new regular education teacher in 3d grade."  (March 31, 2008 IEP at 47.)

Deafblind Coordinator Consulting — "Professional with experience and training in working with children with deafblindness will consult with teachers, therapists, parents, and intervener on an ongoing basis."  Training is to be provided at school.  As for the frequency of the training: "At least 1 time per week for the first 3 months of Derrick's program.  Then the frequency may be re-evaluated by the IEP team or continue at this frequency."  (March 31, 2008 IEP at 47.)

Intervener trainer — "Experienced and qualified trainer to train intervener."  Training is to occur at various locations.  As for the frequency of this training, "Initial 5-day training session before the intervener starts, followed by 10-day training while the intervener starts working with Derrick.  Then periodic training sessions over the first 6 months of Derrick's program (at least 3 one-hour training sessions).  Additional training as needed and determined by the trainer." (March 31, 2006 IEP at 47–48.)

Communication with Parents — "Contact person from educational team will communicate with Derrick's parents about his progress and/or issues."  The communication is to occur "[i]n writing, via email, by phone, or in person" at least once a week.  (March 31, 2006 IEP at 48.)

Extended School Year Services ("ESY") — The IEP calls for extended school year ("ESY") services.

Transition Plan — The IEP also includes a detailed transition plan for Derrick to return to school.  The transition plan addresses the District's responsibilities regarding intervener training, and sets forth a schedule for Derrick's transportation, attendance, and evaluations for the remaining spring semester.  The transition plan also requires the development of an ESY plan for the 2006 summer.

Pursuant to the IEP and transition plan, Derrick attended school from approximately April 3, 2006 until April 12, 2006.  (Sherry F. Dep. 84:8–17.)  At that point, Derrick's parents withdrew him from the school because he had a bruised chin caused by self-abuse.  (*Id.* 86:11–27.)  Derrick's parents attributed the injury to insufficient training of Derrick's intervener and the lack of a deafblind coordinator to train Derrick's team.  (*Id*. 86:22–24.)  Derrick did not return to the school until November 2006.  (*Id*. 86:25–87:1.)

Throughout the summer, Derrick's parents met with District officials to try to arrange for Derrick's return to school and implementation of the IEP.  On June 30, 2006, PDE issued a CIR in response to the March complaint.  (Doc. 69, Ex. E.) The PDE investigator concluded that the District failed to provide a FAPE for the period from February 8, 2006 until April 3, 2006, and awarded Derrick 100 hours of compensatory education for that time.  However, PDE found that compensatory education was not required for the period after April 3, 2006, because Derrick's absence from school caused his failure to participate in an education program.  (Doc. 69, Ex. E at 5.)  PDE further ordered the District to convene an IEP meeting no later than July 21, 2006 in order to develop a plan to provide the compensatory education. (*Id.*)

## C.    Lawsuit and Preliminary Injunction

On July 26, 2006, Plaintiff initiated this action by filing a complaint (Doc. 69) and a motion for a preliminary injunction (Doc. 2).  In Counts I, II, and III of the complaint,[4] Plaintiff alleges that Defendant has failed to provide him with a free appropriate public education ("FAPE") by failing to implement Derrick's IEP. Count I alleges a violation of the IDEA.  Counts II and III allege that Defendant violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 792, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12161, respectively, by intentionally and willfully denying Plaintiff the benefits of a free appropriate public education ("FAPE") based solely on Plaintiff's disability.  Plaintiff alleges that Defendant discriminated against him by its "refusal to (a) implement an appropriate program for Derrick in a regular school placement as ordered by the Hearing Officer

---

[4]   The initial complaint also included a claim under 42 U.S.C. § 1983.  This was withdrawn by Plaintiff following the Third Circuit's decision in *A.W. v. Jersey City Public Schools*, that IDEA rights could not be vindicated pursuant to § 1983.  *See* 486 F.3d 791 (3d Cir. 2007) (en banc).

on October 31, 2005; and (b) implement the appropriate program set forth in Derrick's IEP." (Amend. Compl. ¶ 124.)

After a hearing, Plaintiff's motion for a preliminary injunction was granted in part and denied in part. (Doc. 25.) On September 1, 2006, this court issued a preliminary injunction requiring the District to provide an experienced and qualified trainer to provide additional training to Derrick's intervenor within 30 days of the date of the order. Defendant filed a motion for reconsideration (Doc. 26), which was denied (Doc. 30).

### D.   2006–08 School Years

In November 2006, Derrick returned to Locust Grove Elementary School, but Derrick's parents remained dissatisfied with the District and its efforts to educate Derrick. Plaintiff alleges that the following events—many of which are disputed by the District—constituted a campaign of retaliation and harassment against Derrick.

First, Plaintiff alleges that during a training session for District employees in California during the summer of 2006, Derrick's mother observed Mary Smith, a teacher, write "Hell Child Team" on a notebook, allegedly in reference to Derrick, and pass it to Donald Mazreku, the special education supervisor for the LIU. (Sherry F. Dep. 160:2–162:7.) The District denies that such a statement was ever made.[5] Derrick was not present at the training session, and there is no evidence that he was ever made aware of the alleged statement.

Derrick's parents disagreed with the District's choices to serve as Derrick's intervener. Susan Prowell was hired in April 2006, and served as Derrick's intervener when Derrick returned to school in the fall. As noted above,

---

[5] Plaintiff further alleges that the District later destroyed the note, a claim the District denies.

Prowell had been Derrick's in-home intervener during the 2004–05 school year. Penni Telleck served as Derrick's intervener trainer.  Before the training could be completed, Prowell resigned.[6]  Kelly Snyder was hired as Prowell's replacement. Plaintiff objected to Prowell on the grounds that she was unprofessional, and her replacement, Snyder, on the grounds that she was unqualified.

Derrick's parents also disagreed with a number of the District's education choices in the classroom.  For instance, Plaintiff disagreed with the location of Derrick's desk in the classroom, and claims that an amplification system installed for Derrick's benefit was used to provide instruction to other students instead.  Additionally, Plaintiff claims that Derrick's IEP required direct instruction by the regular third grade teacher, and asserts that the District failed to provide such instruction.  These claims are disputed by Defendant.

Finally, Derrick's parents claim that the District has limited their observation of Derrick in the classroom, and denied them permission to accompany Derrick on a third grade class field trip in December 2006.  The parties dispute whether the District ever denied any request of Derrick's parents to observe Derrick in the classroom.  Both parties agree that the parents were not permitted to attend the field trip, although they dispute the District's motivations for the denial.

E.    **Amended Complaint**

On October 24, 2007, Plaintiff filed an amended complaint adding additional Section 504 and ADA claims for retaliation and hostile learning environment for events occurring after the initiation of this lawsuit. (Doc. 69.)

---

[6] On January 25, 2007, Plaintiff filed a motion to find Defendant in contempt of the court's preliminary injunction order, arguing that Defendant failed to provide the final day of the ten day intervener training required by Derrick's IEP.  (Doc. 39.)  The court denied the motion, but ordered the District to complete the final day of intervener training no later than March 16, 2007.  (Doc. 44.)

Counts IV through V are claims of retaliation in violation of Section 504 and the ADA, respectively, based on events occurring after the conclusion of the 2005–06 school year and continuing until the present.  Plaintiff claims Defendant retaliated against Plaintiff for filing a lawsuit by "(a) placing Derrick in the rear of the classroom; (b) using the classroom amplification system designed for Derrick for instruction to all students but Derrick; (c) failing to provide direct instruction to Derrick as directed under the Court ordered IEP; (d) precluding Derrick's parents from attending school field trips; (e) disallowing Derrick's parents to observe Derrick in the classroom; (f) allowing the intervener originally hired by the School District to continue as Derrick's intervener until March 2007; (g) hiring Kelly Snyder as Derrick's new intervener; (h) referring to Derrick as "Hell Child"; and (i) precluding Derrick's parents from observing him in the classroom."  (Amend. Compl. ¶ 139.)

Counts VI and VII are claims of a hostile learning environment because of disability under Section 504 and the ADA, respectively.  The hostile learning environment claims are based on the same conduct alleged in Counts IV and V.

Plaintiff seeks a permanent injunction ordering Defendants to (1) provide Derrick with an extended school year, and (2) comply with Derrick's IEP, including obtaining required training and support for Derrick's intervener and school team.  Plaintiff also seeks compensatory damages for the 2005 and 2006 school years and attorney's fees.[7]

On December 31, 2007, Defendant filed a motion pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss all counts in Plaintiff's complaint for lack of subject

---

[7] Plaintiff also sought lost future wages suffered by Derrick for failure to provide a free appropriate public education in 2005-06, but withdrew this claim in response to Defendant's motion for summary judgment.

matter jurisdiction for failure to exhaust administrative remedies and collateral estoppel.  (Doc. 77.)  A brief in support thereof was filed on January 15, 2008 (Doc. 80).  Plaintiff filed a brief in opposition on February 4, 2008.  (Doc. 81.)  Defendant filed a reply brief on February 15, 2008.  (Doc. 91.)  Thus the motion is ripe for disposition.

On February 15, 2008, Defendant filed a motion for summary judgment. (Doc. 88.)  A brief in support of the motion was filed the same day.  (Doc. 89.)  The summary judgment motion also raised the issues of failure to exhaust administrative remedies and collateral estoppel, but added five additional arguments.  Plaintiff filed a brief in opposition on March 4, 2008.  (Doc. 95.)  A reply brief was filed on March 21, 2008.  (Doc. 101.)  Thus, the summary judgment motion is ripe for disposition.

Also pending is Plaintiff's motion *in limine*, filed on March 10, 2008, seeking to prevent counsel for Defendant from testifying at trial.  (Doc. 97.)  The parties have briefed this issue, (*see* Docs. 98, 100, 103), which is also ripe for disposition.


III.         **Standard of Review**

Although Defendant has filed both a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and a motion for summary judgment, Defendant's arguments in favor of the motion to dismiss are repeated in their entirety in Defendant's motion for summary judgment.   In both motions, Defendant argues that Plaintiff has failed to exhaust administrative remedies prior to filing suit and that Plaintiff's claims are barred by the doctrine of collateral estoppel.  Because these claims are identical, and refer to documents outside the pleadings, these claims, and the others raised in Defendant's motion for summary judgment, will be addressed under the summary judgment standard.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

**IV.**     **Discussion**

Defendant seeks summary judgment on six grounds: (1) Plaintiff failed to exhaust his administrative remedies prior to seeking suit, or in the alternative, (2) Plaintiff is collaterally estopped from bringing any claim for relief for the 2005–06 school year; (3) compensatory damages are unavailable for Plaintiff's IDEA claims; (4) there is no evidence that Defendant discriminated against Plaintiff on the basis of disability for failure to implement his IEP; (5) there are legitimate, non-retaliatory reasons for each alleged act of retaliation; and (6) Plaintiff cannot prevail in his claim of hostile learning environment. These arguments will be addressed in turn.

**A.**     **Exhaustion of Administrative Remedies**

**1.**     **IDEA Claims**

Defendant seeks to dismiss Plaintiff's IDEA claim in Count I on the ground that it has not been exhausted. Plaintiff argues that the futility exception to exhaustion applies because Plaintiff is challenging the implementation of his IEP, and not the substance of the IEP itself.

Prior to bringing an IDEA claim in federal court, an aggrieved party must exhaust a state's administrative procedures. 20 U.S.C. § 1415(e)(2). However, exhaustion is not required where it would be futile. *Komnios v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994). Exhaustion is generally futile where a plaintiff challenges a school district's failure to implement an IEP, because administrative procedures do not provide an adequate remedy. *See Polera v. Bd. of Educ. of Newburgh Enlarged City School Dist.*, 288 F.3d 478, 488–89 (2d Cir. 2002); *Porter v. Bd. of Trustees of Manhattan Beach Unified School Dist.*, 207 F.3d 1064 (9th Cir. 2002), *cert. denied*, 537 U.S. 1194 (2002); *SJB ex rel. Berkhout v. N.Y.C. Dep't of Educ.*, No. 03 Civ. 6653 (NRB), 2004 WL 1586500, at *5 (S.D.N.Y. 2004); *Joseph M. v. Ne. Educ. Intermediate Unit 19*, 516 F. Supp. 2d 424, 438 (M.D.

Pa. 2007).  As the court in *Joseph M.* explained, "[w]hile a challenge to the contents of an IEP would require exhaustion of administrative remedies—since school administrators are in the best position to establish appropriate educational programs—exhaustion of administrative remedies when a plaintiff is challenging only a failure to implement an IEP would prove fruitless."  *Joseph M.*, 516 F. Supp. 2d at 438; *see also Jeremy H. by Hunter v. Mt. Lebanon Sch. Dist.*, 95 F.3d 272, 282–83 (3d Cir. 1996); *Joseph M. ex rel. Kimberly F. v. Se. Delco Sch. Dist.*, No. Civ. A. 99-4645, 2001 WL 283154, at *7 (E.D. Pa. March 19, 2001).

Here, exhaustion of administrative remedies would be futile because Plaintiff does not challenge the substance of his IEP, but rather its implementation by Defendants.[8]  The parties have already exhausted administrative remedies with respect to Derrick's placement, and Plaintiff received the administrative remedy he was seeking.  Moreover, although not required, *see Jeremy H.*, 95 F.3d at 282–83, here Plaintiff has taken an extra step and exhausted the elective remedy offered by the Pennsylvania Department of Education to enforce the IEP.  Now Plaintiff seeks to enforce those remedies in this court.  The administrative process can provide no further relief to Plaintiff.   Accordingly, Plaintiff's failure to implement claim falls within the futility exception to the IDEA exhaustion requirement.

### 2.    Section 504 and ADA Claims

Defendant further argues that Plaintiff's Section 504 and ADA claims must be dismissed for failure to exhaust the administrative remedies available under the IDEA.  Where a plaintiff brings an action under Section 504 or the ADA seeking

---

[8] Defendant failed to respond to Plaintiff's arguments concerning the futility exception to the exhaustion requirement for failure-to-implement claims.  Contrary to Defendant's claim, Plaintiff does not argue that his failure to further exhaust administrative remedies with respect to his IDEA claims is excused because he is seeking money damages in addition to equitable relief.

relief that is also available under the IDEA, exhaustion of the administrative remedies provided by the IDEA is required "to the same extent as would be required had the action been brought under [the IDEA]."  20 U.S.C. § 1415(l).

Here, Plaintiff brings a number of claims under the ADA and Section 504.  In Counts II and III of the amended complaint Plaintiff seeks relief for FAPE-related claims for Defendant's failure to enforce Derrick's IEP.  These claims stem from the same core of facts as Plaintiff's IDEA claim in Count I; thus, relief is also available for these claims under the IDEA.  However, as discussed above, Plaintiff's IDEA claim falls within the futility exception to exhaustion.  Because exhaustion is not required for Plaintiff's IDEA claim, it is likewise not required for Plaintiff's ADA and Section 504 claims arising out of the same core of facts.

On the other hand, in Counts IV-VII, Plaintiff brings Section 504 and ADA claims for retaliation and hostile learning environment discrimination.  Neither of these claims seeks relief that is also available under the IDEA.[9]  Thus, Plaintiff was not required to exhaust IDEA remedies for those claims prior to bringing those claims in federal court.

### B.    Collateral Estoppel

Defendant also claims that the doctrine of collateral estoppel requires this court to give preclusive effect to the CIR issued by the PDE relating to Plaintiff's claims for the 2005–06 school year.  In the CIR, the PDE found that Defendant failed to implement the Hearing Officer's orders within the time required, and awarded Plaintiff 100 hours of compensatory education for the time period from February 8, 2006 until April 3, 2006.  (Doc. 69, Ex. E.)  However, the PDE found

---

[9]  To the extent that these claims are based on Defendant's alleged failure to implement Derrick's IEP following the initiation of this suit, further exhaustion of administrative remedies is not required because exhaustion would be futile.

that no compensatory education was required for the period after April 3, 2006, when Derrick returned to school, because he was removed from the school unilaterally by his parents.  Defendant argues that the CIR is "final and unappealed" so that the doctrine of collateral estoppel bars this court from considering it.

Collateral estoppel, or issue preclusion, bars an issue of fact or law from being relitigated where it has already been litigated and decided by a valid and final judgment on the merits.  Closely related to collateral estoppel is the doctrine of *res judicata*, which bars relitigation of a claim decided in a prior proceeding.  Generally preclusive effect is granted only to judgments of courts, not administrative agencies.  Whether an administrative process should be given preclusive effect depends on whether that process is sufficiently judicial in nature.  *See Colon v. Colonial Intermediate Unit 20*, 443 F. Supp. 2d 659, 684 (M.D. Pa. 2006); *Gutin v. Wash. Twp. Bd. of Educ.*, 467 F. Supp. 2d 414, 422 n.15 (D.N.J. 2006). Important factors include whether the administrative agency is acting in a judicial capacity, whether it resolves issues of fact, and whether the process is adversarial and the parties have an opportunity to present their arguments.  *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 421–22 (1966).

Although this court's own research yielded no federal cases examining the preclusive effect of PDE's complaint investigative procedure, a number of Pennsylvania state courts have considered the issue and held that the CIR is not sufficiently judicial to be given preclusive effect.  *See, e.g.*, *Montour Sch. Dist. v. S.T.*, 805 A.2d 29, 40–41 (Pa. Cmmw. Ct. 2002); *Carlynton Sch. Dist. v. D.S.*, 815 A.2d 666, 669–70 (Pa. Cmmw. Ct. 2003).  The *Montour* court determined that the complaint investigation procedure is not comparable to a judicial proceeding because it involves no hearing, no presentation of evidence or witnesses, and no credibility determination.  *Id.* at 41.  Instead, the CIR is produced by a PDE advisor who

prepares the report after interviewing witnesses and reviewing materials. *Id.* This court finds that reasoning persuasive, and agrees that the complaint investigative procedure is not the type of administrative decision that should be given preclusive effect by a court.

Moreover, it makes no sense for the doctrine of collateral estoppel to preclude relitigation of an administrative decision in an IDEA action. As Defendant vigorously argued above, exhaustion of administrative remedies is a *prerequisite* to filing an IDEA suit. It would be absurd to hold, as Defendant urges, that a decision by an administrative agency precludes judicial review of that decision. If this were true, then courts would be barred from reviewing all failure to implement challenges under the IDEA where a party first invokes the voluntary complaint investigation procedure. For these reasons, the CIR does not preclude this court from examining issues related to the 2005–06 school year.

### C.   Compensatory Damages for IDEA, Section 504, and ADA Claims

Defendant argues that compensatory damages are unavailable for Plaintiff's IDEA claims, and related Section 504 and ADA claims for failure to provide a FAPE.

### 1.   IDEA Claims

The IDEA provides that a court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Third Circuit has not yet considered whether compensatory damages are available under the IDEA. *See C.M. v. Bd. of Educ. of Union County Reg'l High Sch. Dist.*, 128 Fed. App'x 876, 880 (3d Cir. 2005) (non-precedential); *Bucks County Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 68 n.5 (3d Cir. 2004). However, the Courts of Appeal that have considered the issue have all held that compensatory

damages are not available under the IDEA.  *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 124–25 (1st Cir. 2003); *Polera v. Bd. of Educ. of Newburgh Enlarged Sch. Dist.*, 288 F.3d 478, 483–86 (2d Cir. 2002); *Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 526–28 (4th Cir. 1998); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.*, 98 F.3d 989, 991 (7th Cir. 1996); *Witte v. Clark County Sch. Dist.*, 197 F.3d 1271 (9th Cir. 1999).  At least two district courts in the Third Circuit have been persuaded by the reasoning of these cases to hold that compensatory damages are not available under the IDEA, with the exception of reimbursement for private educational placement and compensatory education.  *See C.J.G. v. Scranton Sch. Dist.*, No. 3:07-CV-1314, 2007 WL 4269816, at *8 (M.D. Pa. Dec. 3, 2007); *Brandon V. v. Chichester Sch. Dist.*, No. 06-4687, 2007 WL 2155722, *3 (E.D. Pa. July 25, 2007).  This court agrees that compensatory damages are not available for an IDEA violation.

Here, Plaintiff's amended complaint seeks compensatory damages.  Although the complaint makes no restriction on how the money might be spent, Plaintiff argues in his reply brief that he "is entitled to seek compensation in the form of a monetary fund or constructive trust so that he may obtain the necessary compensatory education services from an independent source."  (Doc. 95 at 29.)  However, Plaintiff has not yet obtained these services, and so he is not seeking educational reimbursement.  Plaintiff is not entitled to an award of unrestricted compensatory damages, which he seeks in his complaint, regardless of his intended purpose for the funds.  Thus, to the extent that Plaintiff's complaint seeks money damages, summary judgment is granted to Defendant.

## 2.   Section 504 and ADA Claims

Defendant argues that because Plaintiff's ADA and Section 504 claims in Count II and III are based on the same set of facts as the IDEA claims, Plaintiff is

19

precluded from seeking compensatory damages under those statutes as well. However, compensatory damages, including monetary damages, are available for violations of the ADA and Section 504. *See A.W. v. Jersey City Public Sch.*, 486 F.3d 791, 804 (3d Cir. 2007) (en banc); *see also Indiana Area Sch. Dist. v. H.H.*, 428 F. Supp. 2d 361, 364–65 (W.D. Pa. 2006). The fact that these claims are based on the same conduct as the IDEA claims makes no difference. Accordingly, Plaintiff may seek compensatory damages for his Section 504 and ADA claims.

### D.  <u>Discrimination Because of Disability Under Section 504 and ADA</u>

In his amended complaint, Plaintiff has brought three distinct claims under Section 504 and the ADA: (1) discrimination because of disability for Defendant's failure to implement Derrick's IEP (Counts II and III); (2) retaliation for filing the instant lawsuit (Counts IV and V); and (3) hostile learning environment discrimination (Counts VI and VII). According to the amended complaint, the retaliation and hostile learning environment claims are based on alleged acts of retaliation and harassment that occurred after Plaintiff initiated this suit. (*See* Am. Comp. ¶ 66.)

In its summary judgment motion, Defendant appropriately treats each claim separately. However, in his response to Defendant's motion, Plaintiff conflates the first two claims, pointing to evidence of alleged retaliation in support of his claim of discrimination, and vice versa. Plaintiff attempts to justify this approach by arguing that "the elements necessary to establish claims for discrimination and retaliation under Section 504 and the ADA are virtually identical." (Doc. 95 at 21 n.9.) Plaintiff is incorrect. As discussed *infra*, discrimination and retaliation are distinct causes of action, with separate elements, and both aim to prevent different types of harm. There may be cases where the same conduct may constitute both

discrimination and retaliation, but here Plaintiff has identified two distinct factual predicates for the two claims in his amended complaint.

Accordingly, because the factual predicate for the discrimination claims in Counts II and III is Defendant's alleged failure to implement Derrick's IEP, only evidence of discrimination related to the failure to implement the IEP is material to this claim. Plaintiff's choice to combine its response to Defendant's arguments complicates the court's review of this issue. However, for the purpose of deciding the summary judgment motion, the court will consider only the evidence pertinent to each separate claim identified by Plaintiff. Thus, in addressing Defendant's arguments concerning the discrimination claims in Count II and III, the court will disregard the evidence identified by Plaintiff which relates to his retaliation and hostile environment claims.

Turning now to Plaintiff's discrimination claims in Counts II and III of the amended complaint, Plaintiff asserts that Defendant discriminated against Derrick in violation of Section 504 and the ADA by failing to provide a FAPE through its failure to implement an appropriate program for Derrick, and later by failing to implement his IEP.

Both Section 504 of the Rehabilitation Act and the ADA prohibit discrimination against individuals with disabilities by entities receiving public funding. 29 U.S.C. § 794(a) (Section 504); 42 U.S.C. §§ 12161, 12132 (ADA). A party may point to the same conduct as a basis for a claim under the IDEA and Section 504. *Matula*, 76 F.3d at 494 (holding that an IDEA violation may also constitute a Section 504 violation); *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). However, this does not mean "that a violation of the IDEA is a *per se* violation of [Section 504], regardless of whether it meets the independent requirements for [a Section 504]

claim." *Andrew M.*, 490 F.3d at 349.  In order to prevail in a discrimination claim under Section 504, a plaintiff must show that "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Andrew M.*, 490 F.3d at 350 (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999)).  However, a plaintiff cannot prevail simply by proving that he is disabled and that he was denied some service.  Instead, "[t]he state must have failed to provide the service for the sole reason that the child is disabled." *Andrew M.*, 490 F.3d at 350 (holding that summary judgment should have been granted to defendant where denial of services was based on misunderstanding of what the law required, rather than because of disability).

The elements for an ADA claim of discrimination are similar to Section 504, but not identical.  *J.M. ex rel. A.M. v. East Greenwich Twp. Bd. of Educ.*, Civ. No. 07-2861 (NLH), 2008 WL 819968, at *5 (D.N.J. Mar. 28, 2008).  In order to establish a prima facie case of discrimination under the ADA, a plaintiff must prove (1) that he is disabled, (2) that he is a qualified individual with a disability, and (3) that he has suffered an adverse action because of that disability.  *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006) (citations omitted).

Here, Plaintiff's claims of discrimination under both Section 504 and the ADA are based upon Defendant's alleged failure to implement an appropriate program for Derrick, and to implement Derrick's IEP.  Defendant seeks summary judgment on these claims, arguing that (1) Plaintiff was not excluded from participation in, denied the benefits of, or subject to discrimination at the school; (2) Plaintiff has failed to prove that the sole reason for the school's failure to provide services is because he is disabled; and (3) any alleged shortcomings are not the result

of Derrick's disability.  However, Defendant does not challenge the sufficiency of the evidence for Plaintiff's IDEA claim in Count I (arguing instead that Plaintiff failed to exhaust administrative remedies and that the claim is barred by collateral estoppel).

To prevail on a failure to implement claim, a plaintiff must show a failure to implement "substantial or significant provisions of the IEP, as opposed to a mere *de minimus* failure, such that the disabled child was denied a meaningful educational benefit." *Melissa S. v. Sch. Dist. of Pittsburgh*, 183 Fed. App'x 184, 187 (3d Cir. 2006); s*ee also Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000); *Fisher ex rel. T.C. v. Stafford Twp. Bd. of Educ.*, No. 07-1891, 2008 WL 3523992, at *6 (3d Cir. Aug. 14, 2008).  In its summary judgment motion, Defendant did not address the merits of Plaintiff's IDEA claim that Defendant failed to implement Derrick's IEP.  Because this court's analysis of the Section 504 and ADA claims must begin with an examination of the IDEA claim, this court will reserve judgment on these issues until reaching the merit's of Plaintiff's IDEA claim.

## E.   Retaliation Under Section 504 and ADA

Both Section 504 and the ADA contain anti-retaliation provisions.  *See* 34 C.F.R. § 100.7(e) (Section 504); 42 U.S.C. § 12203 (ADA).  A claim of retaliation is subject to the burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Shaner v. Synthes*, 204 F.3d 494, 499 (3d Cir. 2000).  Under this analysis, the burden is first on the plaintiff to satisfy the elements of a prima facie case of retaliation.  *Id.* at 500.  The prima facie elements for a claim of retaliation are the same under ADA and Section 504 as Title VII.  *Houlihan v. Sussex Technical Sch. Dist.*, 461 F. Supp. 2d 252, 257

(D. Del. 2006); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Much of the relevant case law was developed in an employment context, but these principles apply also to the classroom. *P.N. v. Greco*, 282 F. Supp. 2d 221, 241–42 (D.N.J. 2003).

To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity, and the retaliator knew of the involvement; (2) adverse action was taken by the defendant either during or after the protected activity that was sufficient to deter a person of ordinary firmness from engaging in protected activity; and (3) a causal connection between the protected activity and the adverse action. *Shaner*, 204 F.3d at 494; *Hesling v. Seidenberger*, No. 07-2125, 2008 WL 2601334, at *1 (3d Cir. July 2, 2008).

An action must be both materially and objectively adverse in order to qualify as retaliation. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 67–68 (2006). In *Burlington*, the Supreme Court held that in order to satisfy this standard in an employment context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which [in the employment context] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (internal citations omitted). In imposing a materiality requirement, the Court emphasized that "normally petty slights, minor annoyances, and simple lack of good manners" will not deter individuals from complaining about discrimination. *Burlington*, 548 U.S. at 68–69. The court also explained that the context and surrounding circumstances of the action must be considered to determine whether the adverse action satisfies the objective standard. *Id.* at 69. Finally, the Court reiterated that a court reviewing a retaliation claim should consider only the challenged retaliatory act and not the underlying conduct forming the basis for the discrimination complaint. *Id.* at 69–70.

24

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  In the absence of that evidence the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." *Lauren W.*, 480 F.3d at 378 (citations and internal quotations omitted).  The Third Circuit has counseled that "a court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." *Id.*

If a plaintiff establishes the prima facie case of retaliation, then the burden of production shifts to the defendant to advance a legitimate, non-retaliatory reason for the adverse action. *Shaner*, 204 F.3d at 500.  If the defendant satisfies its burden, then the burden of production shifts back to the plaintiff to identify sufficient evidence for a fact finder to conclude that the defendant's proffered reason is pretextual. *Id.* at 501.  Evidence is sufficient if it would permit a factfinder to find that retaliatory animus had a determinative effect on the defendant's action. *Id*. at 501 n.8.  "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Here, there can be no doubt that the first element of the prima facie case is satisfied—Plaintiff has engaged in protected activity by initiating the instant suit, and Defendant is well aware of that fact.  However, Defendant argues that there is no evidence of a causal connection between Plaintiff's protected activity and the alleged

acts of retaliation.  Additionally, Defendant argues that the undisputed facts demonstrate that the District had legitimate, non-retaliatory reasons for most of the alleged acts of retaliation.  In his response to Defendant's motion for summary judgment, Plaintiff chose to conflate the evidence and arguments in support of his discrimination and retaliation claim.  However, as noted above, those are different claims subject to a different legal standard, and predicated on different facts.  Because Plaintiff's retaliation claim is based on the protected activity of filing this lawsuit, the only material facts are those based on events occurring after the suit was filed in July 2006.  All other evidence from events prior to that date will be disregarded in addressing Plaintiff's claim of retaliation. The court will now address in turn each alleged act of retaliation, and Defendant's proffered non-discriminatory reason for the action.

**1.**    <u>**Derrick's placement in the rear of the classroom**</u>

Plaintiff asserts that Derrick was placed in the rear of the classroom, and away from other children.  (Pl.'s Statement of Material Facts Not in Dispute ¶ 56.) In response, Defendant asserts that Derrick's placement was not segregated from other students, and that Derrick's position is equidistant from other students in the classroom.  (Def.'s Statement of Material Facts Not in Dispute ¶ 56.)  Plaintiff has offered no evidence from which a fact finder could conclude that Derrick is segregated from other students.  Plaintiff provides deposition testimony from two teachers, Gretta O'Brien and Lettie Smith, who describe the position of Derrick's desk in the classroom in the left rear area of the classroom, in the last row with other students. (*See* O'Brien Dep. 66:22–25; 110:5–110:12, Sept. 14, 2007; Smith Dep. 139:17–140:23, Sept. 18, 2007.)  However, this evidence does not support the proposition that Derrick was segregated from other students, much less that the placement was in retaliation for filing litigation.  As Defendant points out, in the

26

same deposition Lettie Smith, clearly explained that Derrick was in "the back left corner of the student area, not the back left corner of the room itself." (Smith Dep. 111:13–15.) Plaintiff has offered a distorted view of the evidence on this point.

Moreover, Defendant has proffered a legitimate, nondiscriminatory reason for the placement. According to Defendant, Derrick's space was chosen because it was the only location in the classroom with enough room to accommodate Derrick's intervener and other classroom aids. (Defendant's Statement of Material Facts Not in Dispute ¶¶ 56, 77.) Additionally, the space was selected to shield Derrick from ambient noise, a vent, and glare from the sun through the windows. (*See* Donald Mazreku Dep. 105:8–16, Dec. 3, 2007; Smith Dep. 111:16–112:23.) Plaintiff disputes this explanation, arguing that the true purpose for Derrick's classroom location was to provide Derrick with special instruction rather than instruction from the general education teacher. Even if this were true—and Plaintiff has offered no evidence in support of this claim—it does not indicate a retaliatory purpose for the placement. Significantly, Plaintiff points to no evidence suggesting that any other location in the classroom would be suitable for Derrick.[10] Accordingly, summary judgment will be granted to Defendant on this claim.

**2.    Using classroom amplification system designed for Derrick for instruction to all students but Derrick**

Plaintiff cites as an example of retaliation the undisputed fact that an amplification system designed for Derrick's was not used for his benefit, but was occasionally used for students other than Derrick. In doing so, Plaintiff ignores the

---

[10] In his opposition brief, Plaintiff asserts that Derrick had been placed in the front of the classroom before the lawsuit was filed. (*See* Doc. 95 at 24–25.) However, none of the evidence cited by Plaintiff supports this proposition.

undisputed evidence that soon after the system was installed, it was discovered that the amplification interfered with Derrick's cochlear implant. (O'Brien Dep. 83:12–84:3.) Accordingly, Defendants discontinued the use of the system for Derrick's benefit alone. However, Derrick's general education teacher used the device to amplify her voice when Derrick's verbalizations became so loud that his classmates were unable to hear the instruction given by her. (O'Brien Dep. 83:22–84:3.)

The record is devoid of evidence that the District's actions relating to the amplification system were in any way adverse to Derrick, let alone sufficiently adverse as to dissuade a reasonable person from complaining about discrimination. Plaintiff's continued insistence that Defendant's actions with respect to the amplification system were retaliatory or in any way improper is entirely without basis in fact or law, and borders on frivolous. Accordingly, summary judgment is granted to Defendant on this point.

### 3. Failing to provide direct instruction to Derrick as directed under the court-ordered IEP

Plaintiff alleges that on a number of occasions, Derrick's intervener, rather than Derrick's general education teacher, provided direct instruction to him, allegedly in violation of Derrick's IEP. Essentially this argument attempts to repackage a portion of Plaintiff's IDEA failure to implement claim as retaliation. The parties vigorously dispute the legal issues of whether Derrick's IEP requires direct instruction, and what direct instruction requires. However, the following facts are undisputed: When Derrick returned to school in November 2006, his intervener strictly interpreted every word of the regular education teacher for a week. Unable to understand what was being taught or how it related to him, Derrick became

frustrated and cried.  (Laura Fitz Dep. 127:12–131:22, Oct. 5, 2007.)  Thereafter, his regular teacher met with Lettie Smith to adapt the general curriculum to meet Derrick's needs.  (*Id.*)  Under this arrangement, some instruction was directly interpreted from the general education teacher, but concepts which were unfamiliar to Derrick, or which required some further explanation were taught by Smith directly.  (*Id.*)  Derrick "did seem to have much better understanding when [Smith] did direct instruction at his level and presented him with information that made sense to him."  (Fitz Dep. 128:1–5.)

Plaintiff does not cite any particular portion of Derrick's IEP that requires "direct instruction" from the regular education teacher, or which supports the proposition that the instruction provided by the District violates the IEP.  Indeed, Derrick's IEP requires "adaptations and modifications to the general education curriculum as designed by the teacher / therapist with intervener" to be provided "in all settings throughout school" on a daily basis.  (March 31, 2006 IEP at 43.)  The undisputed evidence establishes that Derrick's teachers adapted the curriculum and Derrick's instruction after finding that Derrick was unable to understand the literal interpretation of the general education teacher's instruction.  No reasonable trier of fact could view this evidence as anything other than a good faith attempt to implement Derrick's IEP.  There is simply no evidence of record from which a trier of fact could determine that the District's method of instructing Derrick falls short of what is required by Derrick's IEP, let alone that it is adverse to him in any way.

Moreover, even if a trier of fact were to conclude that failure to provide "direct instruction" was an adverse action, the retaliation claim must fail because Plaintiff has failed to point to any evidence to establish the third element of the

prima facie case—causation.  There is no evidence that any alleged failure to implement Derrick's IEP with respect to classroom instruction is the product of intentional retaliation against Plaintiff for engaging in protected activity.  In other words, there is no evidence of record from which a trier of fact could reasonable infer that the District failed to implement Derrick's IEP *because* he filed a lawsuit. To the contrary, the evidence cited by Plaintiff demonstrates that since the lawsuit was filed, the District has made a good faith effort to implement Derrick's IEP. Accordingly, Plaintiff has not met his burden of offering evidence sufficient to satisfy the element of causation.  Thus Plaintiff has not established a prima facie case of retaliation with respect to direct instruction, and summary judgment is granted to Defendant on this point.

### 4.   **Classroom Observation**

As another act of retaliation, Plaintiff alleges that Derrick's parents were precluded from observing him at school.  Specifically, Derrick's parents allege that on a number of occasions, they requested to observe Derrick in the classroom, but the school failed to respond to their requests.  The District disputes this allegation, asserting that it has granted every request by Derrick's parents to observe him in the classroom.  The District further asserts that it has a visitation policy applicable to all parents limiting classroom observation, but that Derrick's parents have been granted an exception to permit more frequent visits.

Plaintiff offers three pieces of evidence to support the allegation that Derrick's parents' classroom observations of Derrick were limited.  The first is a deposition by Derrick's father, who testified that he was required to call Donald Mazreku for permission to observe Derrick's classroom during the 2006–07 school

year.  While he was granted permission to visit Derrick's classroom "a couple of times" he asserts that there "were times" that he was not allowed to visit.  (Scott F. Dep. 86:23–87:25.)  Derrick's father does not specify how many times he was not permitted to visit.  Similarly, Derrick's mother testified that during the 2006–07 school year, "Our visits were restricted, and the majority of our requests were never answered."  (Sherry F. Dep. 102:24–103:6.)  According to Plaintiff's mother, no request was ever denied; the parents never received an answer from the school.  (*Id.* 103:21–24.)  However, when asked how often she was permitted to observe, Plaintiff's mother could recall at least two occasions—one visit in December 2006, and another in January or February of 2007.  (*Id.* 103:7–20.)  Finally, Plaintiff points to deposition of Penni Telleck, who testified that Donald Mazreku told her that the classroom observation time of Derrick's parents would be limited.  (Telleck Dep. 59:11–17.)  Telleck testified that he did not tell her why the observations would be limited.  (*Id.* 59:18–19.)  Moreover, Telleck declined to speculate whether the action was taken as a result of the lawsuit, though she noted that the lawsuit had caused a lot of anxiety among the teachers in the classroom, and that the teachers felt intimidated by Derrick's parents, who were often critical of their efforts.  (Telleck Dep. 59:11–19; 58:9–16.)

On the other hand, Defendant points to the testimony of Donald Mazreku at his deposition that every request by Derrick's parents to observe Derrick in the classroom were granted.  (Mazreku Dep. 175:14–20.)  Accordingly, there is genuine dispute of fact between the parties on the factual question of whether the District failed to respond to any of Derrick's parents' requests to observe.  At this

stage in the litigation, this dispute must be resolved in favor of Plaintiff, the nonmoving party.

Nevertheless, the claim must fail because Defendant has proffered evidence of a legitimate, nonretaliatory reason to limit classroom observation, which Plaintiff has failed to rebut.  There is no dispute that the District has a policy, applicable to all parents, that limits classroom observation.  (Pl.'s Statement of Undisputed Material Facts ¶ 79.)  The purpose of the policy is to avoid the disruption to a class that results from having individuals in and out of the classroom.  (O'Brien Dep. 126:9–12.)  There is also no dispute that despite this policy, Derrick's parents were permitted to observe Derrick in the classroom on a number of occasions.  Defendant asserts that it has granted an exception to Derrick's parents, so that they could observe Derrick in the classroom more often than other parents.  Plaintiff disputes the District's characterization of those observations as the grant of an exception to the general policy.  Essentially, the parties disagree about the degree to which the District has exempted Derrick's parents from a rule of general applicability.  However, there is no dispute that the policy existed, that it applied to all parents, and that Derrick's parents were nonetheless granted permission to observe Derrick in the classroom on a number of occasions.  Accordingly, Defendant has proffered sufficient evidence to satisfy its burden of demonstrating a legitimate, non-retaliatory reason to limit the classroom observation of Derrick's parents.

However, Plaintiff has offered no evidence sufficient for a reasonable trier of fact to determine that Defendant's proffered justification is a pretext for retaliation.  Indeed, as noted above, the evidence establishes that despite the existence of this policy, Derrick's parents have been permitted to observe Derrick in

the classroom on numerous occasions.  Plaintiff provides no evidence from which a trier of fact could determine that Defendant's proferred justification is pretextual. Accordingly, Defendant is entitled to summary judgment on this claim.

### 5.    Class field trip

Plaintiff argues that Derrick's parents were barred from attending a third grade class field trip with Derrick in December 2006 in retaliation for filing this suit. It is undisputed that Derrick's parents were not permitted to attend the field trip. Defendant responds that the purpose for the decision was to treat Derrick's parents like all other parents, and that it was not motivated by retaliatory animus.

Plaintiff has presented insufficient evidence to demonstrate that the decision to deny the parent's request to attend the field trip was caused by retaliatory animus.  In support of such a connection, Plaintiff points to notes made by Donald Mazreku during a telephone call with Derrick's father, Scott, during which Mazreku explained the reasons for the District's decision.  In a handwritten note concerning that conversation, Mazreku wrote the following:

> Visitations: IU policy (up to 45 min) Currently conducting 30 min observations followed by 30 min summary conference.
> — Every request has been approved except 1
>    — 3rd grade field trip for (Burns) Center in York
> — Team & 3rd grade had the support needed for a successful experience
> — Having just completed a month long transition to school environment this trip would offer a new environment for the student (unprepared and not explored)
> — Parent close prox. may neg. impact student behavior (small room)
> — Trip offered concerns: transport, room size, room layout, Student familiar with environment, Format of presentation.
> — Team needs to reduce unknown variables as much as possible.
> — Team focus need to be placed on variables and not on observers.
> — Parent (Scott) ask why team are on pins and needles.
> — Response – labor intensive
>       – work pressures
>       – Meetings (IEP) w/ attorney

>     – Federal court pending
>     – Negative comments made by parents (Day following IEP
>         Sherry)

(Doc. 96, Ex. 19.)

       In his deposition, Donald Mazreku explained his decision to not permit Derrick's parents to attend the class field trip as follows: "I received a phone call I believe it was the night prior from [Derrick's father]. The rationale that I gave for not approving their visitation is stated there in the email, that for that trip, that the class had needed chaperone support. In addition to that, to my knowledge, no other parents attended that field trip as chaperone. With that into account I said no." (Mazreku Dep. 173:9–16.) Mazreku went on to explain that the lawsuit "by no means is the reason why they were not included as part of this trip. In addition, I'm within my grounds to make that decision, and this was another example why folks are on edge, because something as small as a request like this, if it doesn't go their way, it's scrutinized and I have to answer to attorneys, not just today, but at prior events, that I have to explain something so small." (*Id*. 174:11–19.)

       According to Plaintiff, the note establishes a causal connection between the decision to deny Derrick's parents permission to attend the field trip and the lawsuit because the words "federal court pending" appear on the page. However, the plain language of the note indicates that the words were not an explanation for the District's decision, but instead came in response to an inquiry by Derrick's father about why the IEP team "was on pins and needles." The parties have now engaged in three long years of administrative and federal litigation, and without a doubt this lawsuit has not been far from the minds of all individuals involved in Derrick's education. However, this fact does not operate to convert every District decision

with which Plaintiff disagrees into a new cause of action for retaliation.  There is simply no evidence, direct or circumstantial, from which a reasonable trier of fact could infer retaliatory intent on the part of the District.  It is undisputed that no other parents were permitted to attend the field trip. The evidence at most demonstrates that the school resisted a demand by Derrick's parents to be treated differently than other parents.  Accordingly, Plaintiff has failed to meet his burden of presenting sufficient evidence for a reasonable trier of fact to infer that its actions were causally linked to the lawsuit.

Additionally, the claim must fail because this action was not materially adverse.  In other words, denial of permission to attend a single class field trip at which no other parents were present is not sufficiently adverse to dissuade a reasonable person in the same situation from vindicating his IDEA rights.

Finally, the claim must fail because the District has satisfied its burden of demonstrating numerous legitimate, non-retaliatory reasons for the decision, which Plaintiff has failed to rebut.  As noted above, Mazreku explained that the decision was justified by the following considerations: no other parents were permitted to attend the field trip, sufficient chaperones were already available, this was an opportunity for Derrick to explore a new and unfamiliar environment, there was a concern that the rooms at the facility would be too small to accommodate additional individuals, and District employees needed to focus their attention on students and not parental observers.  These are all legitimate, non-retaliatory reasons for the decision.  Plaintiff has offered no evidence to rebut these reasonable explanations.  Accordingly, Defendant is entitled to summary judgment on this claim.

### 6.   **Choice of Intervener**

Plaintiff claims that the District retaliated against Derrick through its choice of Derrick's interveners.  Plaintiff objected to Susan Prowell, Derrick's first intervener, on the grounds that she was unprofessional, and her replacement, Kelly Snyder, on the grounds that she was unqualified.  Defendant responds it was justified in hiring both Prowell and Snyder to serve as Derrick's intervener, and that these personnel decisions were not adverse to Derrick, nor were they linked in any way to Plaintiff's lawsuit.

The undisputed facts establish that after an exhaustive search, in the spring of 2006, the District hired Susan Prowell to be Derrick's intervener.  Prowell had already been hired by Derrick's mother to serve in this role for a year during the 2004–05 school year.  There is no dispute that Prowell was qualified to serve as Derrick's intervener.  However, in Prowell's performance review, which is performed annually for all staff, Donald Mazreku determined that Prowell needed improvement in taking direction from teachers and maintaining professional rapport. (Mazreku Dep. 119:9–121:12.)  Specifically, Prowell did not get along with Lettie Smith, Derrick's teacher for the hearing impaired.  These two educators both held strong opposing views about Derrick's education; Prowell could be very critical of Smith's efforts, and vice versa.  (*See, e.g.*, Smith Dep. 65:8–17.)  There were two outbursts by Prowell—both outside of Derrick's presence—and at some point in the spring, the two stopped communicating altogether.  (*Id*. 66:15–68:23.)  However, Derrick's teachers and support professionals continued to carry out Derrick's educational program, though there were some hurt feelings among the educators. (Mazreku Dep. 127:1–6.)  In the early spring of 2007, Prowell unexpectedly

36

resigned.  Derrick's parents were not informed about the friction among the teachers before the resignation.

There is no evidence of record to suggest that Prowell's lack of professionalism impeded her performance as Derrick's intervener in any way.  The only evidence offered by Plaintiff is a statement by Smith that Derrick could "sense" the tension between the teachers, and that the disagreement was not "fair" to Derrick.  (Smith Dep. 86:6–11.)  However, there is no requirement that Derrick be shielded from tension among his teachers, and there is no evidence of record to support Smith's conclusion that the situation was unfair to Derrick.  The evidence establishes nothing more than the fact that Prowell and Smith had serious disagreements about educational decisions in the classroom.  No reasonable trier of fact could conclude that Prowell's tenure as Derrick's intervener constituted adverse action against Derrick.

After Prowell resigned in March 2006, the District hired Kelly Snyder.  Plaintiff alleges that the hiring of Snyder constituted retaliation against Derrick because Snyder's sign skills were not as good as two other finalists for the position.  According to the District, Snyder was chosen for her excellent interpersonal skills and because she had prior experience working with students at the Maryland School for the Blind.  (Mazreku Dep. 147:6–25.)  The two other finalists for the position had better sign language skills than Snyder, but these individuals both lacked experience working with students.  (*Id.* 147:4–14.)  Moreover, although Snyder's sign skills were not as good as the other applicants, Mazreku determined that her sign skills were adequate to serve as Derrick's intervener.  (*Id*. 140:23–141:1.)  Plaintiff maintains that Snyder was unable to effectively communicate with Derrick.  (Pl.'s

Statement of Undisputed Facts ¶ 64.)  However, in support of this proposition, Plaintiff cites only the deposition of Lettie Smith, who testified unequivocally that Snyder "communicates effectively with Derrick."  (Smith Dep. 150:3–8.)  Smith went on to explain that Snyder's skills were limited to receptive rather than expressive communication, but that Snyder's skills were adequate for the type of communication required by Derrick's curriculum.  (*Id.* 150:14–18.)

Plaintiff has offered no evidence that the District's choice of Snyder was adverse to Derrick in any way.  Indeed, it appears that her hiring represents a sincere attempt on the part of the District to respond to Derrick's needs in light of the District's previous concerns with Prowell.  Given that Derrick's parents objected to Prowell for her lack of professionalism, the District cannot subsequently be faulted for placing a higher value on interpersonal skills when it selected Kelly Snyder as Prowell's replacement, particularly when the evidence establishes that Snyder's sign skills were adequate to communicate with Derrick.

In sum, there is no evidence of record from which a reasonable trier of fact could determine that the District's staffing decisions with respect to Derrick's intervener were adverse in any way to Derrick.  Moreover, Plaintiff has offered no evidence to suggest that these personnel decisions were linked in any way to this lawsuit.  Accordingly, Plaintiff has failed to establish a prima facie case of retaliation on this claim and summary judgment will be granted to Defendant on this point.

### 7.    <u>Referring to Derrick as "Hell Child"</u>

Plaintiff asserts that nine days after initiating a lawsuit, Derrick's mother observed Mary Smith, a District employee, refer to Derrick as "Hell Child."

The District denies that Mary Smith ever used the words "hell child" to refer to Plaintiff.  This is a genuine dispute of fact between the parties, and for the purpose of this motion, the court must resolve this dispute in favor of Plaintiff, the nonmoving party.

Nevertheless, Plaintiff's claim must fail because the disputed statement was not materially adverse to Derrick.  No reasonable trier of fact could find that this stray comment, outside Derrick's presence and away from the classroom, among a group of educators attending an out-of-state training seminar, would be sufficient to deter a reasonable person from vindicating his IDEA rights.  Indeed, the statement is precisely the type of petty slight that the Supreme Court declared in *Burlington* would not deter a reasonable person from making a complaint.  548 U.S. at 68–69.  Accordingly, summary judgment is granted to Defendant on this point.

### 8.    <u>Plaintiff's Remaining Evidence</u>

Finally, Plaintiff accuses Defendant of "cherry picking" the factual record, and argues that the entire record viewed as a whole raises multiple genuine issues of material fact that preclude summary judgment.  To the contrary, Defendant has systematically responded to each alleged act of retaliation identified by Plaintiff in the complaint, and for most, offered a legitimate, nondiscriminatory explanation supported by evidence.  As discussed above, for every alleged act of retaliation, Plaintiff has either failed to satisfy the prima facie elements for the claim, or failed to provide evidence from which a reasonable trier of fact could conclude that Defendant's proffered explanation is a pretext.  In an attempt to counter Defendant's arguments, Plaintiff submitted a laundry list of additional perceived slights and inadequacies in Derrick's education program, which Plaintiff alleges amount to

either discrimination or retaliation.  However, these grievances were not included in Plaintiff's amended complaint, and Plaintiff does not explain how they would bolster the claims of retaliation that form the basis for Plaintiff's retaliation claims in the amended complaint.

Moreover, the court has carefully examined the evidence submitted by the parties, and viewing the record as a whole from the time Plaintiff engaged in protected activity by filing this suit, there is no evidence that Defendant acted with retaliatory animus or took any adverse action against Plaintiff.  To the contrary, the record reveals that the District has acted in good faith and made every effort to comply with its obligation to provide Derrick a FAPE in accord with his IEP as required by the IDEA.  Educating a deafblind student is a challenging task for any school district.  That task is even more difficult where as here, the guidelines for the school's responsibilities are less than clear and Plaintiff and the District sincerely and reasonably disagree about what Derrick's IEP requires.  It is debatable whether the District has failed to implement Derrick's IEP from the 2006 until the present, but one thing is clear—the record as a whole reveals no retaliatory animus against Plaintiff.  Accordingly, summary judgment is granted to Defendant as to the retaliation claims in Counts IV and V of the amended complaint.

### F.     Hostile Learning Environment

Defendant argues that no case exists to support a hostile learning environment claim for a special education student in public school.  Plaintiff cites two district court opinions, one published, and one unpublished, for the proposition that such a cause of action exists.  *See Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 314 (D. Mass. 1997) (recognizing cause of action under ADA and Section 504

for hostile learning environment when harassment based on a student's disability has purpose or effect of unreasonably interfering with student's performance or of creating intimidating, hostile, or offensive environment); *Pell v. Trustees of Columbia Univ.*, No. 97 Civ. 0193 (SS), 1998 WL 19989, at *17 (S.D.N.Y. Jan. 21, 1998) (holding that hostile learning environment claims are cognizable under the ADA and Section 504). However, both of those cases occurred in a college setting, and both involved allegations of taunting and other harassment by instructors in the classroom.

Courts recognizing a hostile learning environment under the ADA have applied the same elements and evidentiary standard as in a hostile work environment claim under Title VII. *Pell*, 1998 WL 19989, at *18. Accordingly, in order to prevail on a claim of hostile learning environment, a plaintiff must demonstrate: "(1) that she is a member of a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment is based on a protected characteristic, her disability, (4) that the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment, and (5) that there is a basis for institutional liability." *Guckenberger*, 957 F. Supp. at 314.

In *Harris Forklift*, a case involving a claim of hostile work environment under Title VII, the Supreme Court held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment, Title VII is violated." *Id.* at 21 (internal citations omitted). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

41

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. It is well-established that a single isolated incident of a disparaging remark is insufficient to constitute either severe or pervasive harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Harris*, 510 U.S. at 20.

Without deciding whether hostile learning environment is cognizable in the context of a special education case involving an elementary school student, the court will grant summary judgment to Defendant on this claim because there is no evidence that Defendant subjected Plaintiff to severe or pervasive harassment in the classroom. Here, no reasonable trier of fact could possibly conclude that most of the incidents described in the complaint constitute harassment of Derrick, let alone harassment that is intentional, or severe or pervasive. It is clear that Derrick's parents strongly disagreed with certain of Defendant's educational judgments (Derrick's placement in the classroom, the use of the classroom amplification system, the parent's access to Derrick at school and on field trips, and the mode of instruction to Derrick) and staffing decisions at the school (the choice of Derrick's intervener). However, there is no evidence in the record that any of these actions were taken with the intent to harass Derrick, or that they were sufficiently severe or pervasive to be actionable. Nor is there any evidence that the final incident—the alleged "Hell Child" reference—satisfies the standard. The alleged statement was made outside Derrick's presence, and away from his learning environment, and there is no evidence that he was ever made aware of it, let alone detrimentally affected by it. Moreover, as a single, isolated comment, it is insufficient as a matter of law to constitute severe or pervasive harassment. *Id.*

Because the record is devoid of evidence that Derrick was subjected to any harassment, Defendant is granted summary judgment on Plaintiff's claim of hostile learning environment in Counts VI and VII of the amended complaint.

### G.   Wage Loss for Failure to Provide FAPE

Defendants argue that wage loss is not available for violation of IDEA rights.  In his response, Plaintiff withdraws the request for wage loss damages.  (Doc. 95 at 30.)  Accordingly, this claim will be dismissed.

### H.   Motion *in Limine*

Also pending is Plaintiff's motion *in limine* to prevent defense counsel from testifying at trial as to underlying factual events in this case.  (Doc. 97.) Defendant assures this court that defense counsel do not intend to present themselves as witnesses as trial.  (Doc. 100.)  Accordingly, the motion will be denied as moot.

### III.   Conclusion

In accordance with the foregoing discussion, Defendant's motion to dismiss is denied.  The motion for summary judgment is granted in part and denied in part.  Defendant is granted summary judgment as to Counts IV, V, VI, and VII of the amended complaint, and Plaintiff may not seek compensatory damages for his IDEA claim in Count I.  The court will reserve judgment on Defendant's arguments concerning Plaintiff's discrimination claims in Counts II and III until reaching the merits of the IDEA claim in Count I.  The motion for summary judgment will be

denied in all other respects.  Plaintiff's motion *in limine* is denied as moot.  An appropriate order will issue.


                                           s/Sylvia H. Rambo
                                           SYLVIA H. RAMBO
                                           United States District Judge

Dated:  October 31, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**DERRICK F., a Minor, by his**
**Parents and Natural Guardians,** *et al.,*    :    **Civil No. 1:06-CV-1463**
                                              :
                    **Plaintiffs,**    :    **JUDGE SYLVIA H. RAMBO**
                                              :
                      **v.**    :
                                              :
**RED LION AREA SCHOOL**    :
**DISTRICT,**    :
                                              :
                    **Defendant.**    :
                                              :

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS**

**HEREBY ORDERED THAT**:

    (1)    Defendants' motion to dismiss is **DENIED**.

    (2)    Defendant's motion for summary judgment is **GRANTED IN**

             **PART** and **DENIED IN PART** as follows:

             (a)    The motion is **GRANTED** with respect to Counts IV, V,

                   VI, and VII of the amended complaint.

             (b)    The motion is **GRANTED** with respect to Plaintiff's claim

                   for compensatory damages for his IDEA claim in Count I;

             (C)    In all other respects, the motion is **DENIED**.

    (3)    Plaintiff's motion *in limine* (Doc. 97) is **DENIED AS MOOT**.

    (4)    A new case management order will issue.

                                           s/Sylvia H. Rambo
                                         SYLVIA H. RAMBO
                                         United States District Judge

Dated:  October 31, 2008.